## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| | § | |
| IN RE: | § | CASE NO: 19-10873 |
| | § | |
| FLEETSTAR LLC, | § | CHAPTER 11 |
| | § | |
| DEBTOR. | § | SECTION A |
| | § | |

## MEMORANDUM OPINION AND ORDER

This Court held an evidentiary hearing over the course of two days, January 22, 2020, and February 7, 2020, to resolve the *United States Trustee's Motion To Convert Case to Chapter 7, Or, In the Alternative, Dismiss Case* (the "Motion To Dismiss or Convert"), as supplemented. [ECF Docs. 67, 224 & 282]. The Debtor filed two responses in opposition to the Motion To Dismiss or Convert. [ECF Docs. 86 & 297]. Midland States Bank, Engs Commercial Finance Co., and Sufian Hamed ("Hamed") also filed responses in support of the Motion To Dismiss or Convert. [ECF Docs. 291, 312 & 314]. At the conclusion of the hearing, the Court took the matters under advisement. The Debtor and Hamed filed post-trial briefs, with the Debtor supporting dismissal of the case and Hamed arguing for conversion of the case to one under chapter 7. [ECF Docs. 317 & 318].

Based upon the pleadings, the record, the arguments of counsel, and the testimony presented at the evidentiary hearing, and after due deliberation and sufficient cause appearing therefor, this Court GRANTS the Motion To Dismiss or Convert, converts this case to one under chapter 7, and finds as follows: [1]

---

[1] These findings of fact and conclusions of law constitute the Court's findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052. To the extent that any of the following findings of fact are determined to be conclusions of law, they are adopted and shall be construed and deemed conclusions of law. To the extent any of the following conclusions of law are determined to be findings of fact, they are adopted, and shall be construed and deemed as findings of fact.

## JURISDICTION AND VENUE

This Court has jurisdiction to grant the relief provided for herein pursuant to 28 U.S.C. § 1334 and the Order of Reference of the District Court dated April 11, 1990.  The matter presently before the Court constitutes a core proceeding that this Court may hear and determine on a final basis under 28 U.S.C. § 157(b).  The venue of the Debtor's chapter 11 case is proper under 28 U.S.C. §§ 1408 and 1409(a).

## NOTICE

Notice of the Motion To Dismiss or Convert and its supplements was sufficient and constituted the best notice practicable.  All persons affected by this Memorandum Opinion and Order were afforded a full and fair opportunity to be heard prior to and during the evidentiary hearing.  Notice of the relief granted herein has been given to all persons affected by this decision and is in full compliance with due process.

## FINDINGS OF FACT

### A.  The Debtor's Business Model and Relationships to Ackel Construction, LLC and George Ackel, III

The Debtor, Fleetstar LLC, was organized under the laws of Louisiana on or about June 28, 2018, "for purposes of owning and holding trucks and trailers used in the construction industry." [ECF Doc. 86, at 1].  A week later, on July 2, 2018, the Debtor merged with A & Brothers Construction Company of Louisiana, LLC ("A & Brothers"), with the Debtor becoming the surviving entity.  [ECF Doc. 244, at 12].  The Debtor and a related entity, Ackel Construction, LLC, are wholly owned by Ackel Enterprises, Inc., which, in turn, is wholly owned by George Ackel, III. [ECF Doc. 86, n.1; ECF Doc. 244, n.1].  It has been made clear to this Court throughout this case that the Debtor, Ackel Construction, other related companies, and George Ackel operate

as a single enterprise for the benefit of George Ackel; indeed, it is difficult to tell where one entity ends and another begins, and none of them operate at arms' length with one another.

As explained by the Debtor, since the Debtor organized in late June 2018 until September 2019, the Debtor and Ackel Construction operated pursuant to an informal, unwritten arrangement, whereby the Debtor, in exchange for a commission, relied on Ackel Construction to solicit contracts using the Debtor's trucks, pay for certain truck-related expenses, and remit the net profit to the Debtor.  [ECF Doc. 178, ¶¶ 6–7].  Approximately three months into the case, however, the Debtor had yet to present the Court, creditors, and the UST with an accurate accounting of its finances.  At a status conference on July 29, 2019, the Court found the Debtor's financial submissions outlining post-petition transactions between the Debtor and Ackel Construction to be unclear, unverified, and inaccurate and instructed the Debtor as follows:

> COURT:   Obviously, based on monthly operating reports, there's no income coming into the Debtor, despite the fact that the Debtor has a fleet of trucks that presumably it was leasing to its sister company, Ackel Construction, for use in Ackel's business.  So what I need to know is why isn't Ackel Construction paying the Debtor for the use of those vehicles and do we have any form of written agreement between Ackel Construction and the Debtor?

> COUNSEL: . . . Ackel Construction handles the books and records.  Fleetstar just has paper in essence.   It has tickets for gasoline, for its drivers, DOT notices, etc.  And all of the accounting is done at Ackel Construction . . . .

> But there is a process.  There's a reconciliation process between Fleetstar and between Ackel Construction.  There is not a written agreement.  We will prepare a written agreement, Your Honor.  But he's been operating prior to bankruptcy without a written agreement.  But it is pretty well structured, Judge.  The problem is how the accounting has been lost and he's had to reconstruct much of the accounting . . . .

> COURT:  . . . I want to make a statement in response to your very first statement.  Ackel Construction might be preparing the accountings for the Debtor, but the Debtor has an obligation to ensure that its own accountings are done.  If Ackel Construction can't do it, then Mr. Gros [an independent accountant] or somebody else needs to do it, and the Debtor.  The Debtor actually does own assets, it owns a

fleet of trucks and it buys evidently gas and it has insurance on the trucks and then it should be billing somebody for the use of those trucks.

So I'm going to stop you on the point of "oh no this is all Ackel"—this is not all Ackel.  This is the Debtor.  And at least beginning in April when the Debtor filed for bankruptcy relief, **the Debtor has an obligation to account not only to the Court but to the creditors and the United States Trustee for each and every hour of use that its collateral or its assets have been utilized by some third party, whether it's Ackel Construction or it's "ABC" Corporation.  So frankly, I don't care that Ackel did this prepetition.  It is your obligation to produce accountings from April 4.**

. . . .

And who is going to be preparing these accountings in the future?

COUNSEL:  Mr. Gros.   Fleetstar has no employees.  So in the future, Mr. Gros will be the representative of Fleetstar, Your Honor.  But Fleetstar essentially pays Ackel to prepare these accountings, that's part of the fee . . . the overhead . . . .

. . . .

COURT :  . . . So what I'm trying to stress to you is we're not going on business as usual. . . .  I'm not going to have a debtor who has been in bankruptcy for three months and is just now getting this all prepared.  And if it can't be done on a timely basis and accurately—and I'm not even sure who at Ackel is performing this duty, **but I have some concerns that this is an insider and related company, so I need to have someone on the outside of Ackel Construction verifying the accounting**.

. . . .

Everything has to be accounted for and it starts with a written agreement as to what the relationship is between the parties and who is paying for what charges . . . whether it's insurance, whether it's gas, whether it's repairs, whether if there's damage to the vehicle when it's returned.  Who pays for all that and how much?  And that needs to be justified by some independent market analysis because these are insiders.

Transcribed from the July 29, 2019 hearing (min. 16:36–21:17) (emphasis added).

Based upon those statements by the Court, on September 15, 2019, the Debtor filed a

*Motion Pursuant to 11 U.S.C. §§ 105(a) and 363 for Authority To Enter Into, and Pay Insider*

*Pursuant to Terms of Hauling Services Agreement.*  [ECF Docs. 178, 209 & 222].  The Hauling

Services Agreement was supposed to memorialize the informal arrangement between the Debtor and Ackel Construction and shed light on the finances of the Debtor so that the Court and creditors could assess the Debtor's viability to operate as a going-concern.  Specifically, regarding monthly reconciliation of expenses, the Hauling Services Agreement required Ackel Construction to allocate expenses "on a truck-by-truck basis, deduct[ing expenses] from gross revenue prior to payment to Fleetstar."  [ECF Doc. 178-1, at 1].  The Hauling Services Agreement provided that "revenue and expenses shall be accounted for on a cash basis, with payments of net revenue to Fleetstar on a monthly basis."  *Id.*

### B.  The Debtor's Secured Lenders

The record indicates that when the Debtor merged with A & Brothers in July 2018, the Debtor acquired all of the receivables of A & Brothers as well as assumed most existing payables, including the loans made to A & Brothers by lenders who held purchase-money security interests on various trucks and equipment acquired by the Debtor via the merger.  [ECF Doc. 64, ¶¶ 8–16; ECF Doc. 51, ¶¶ 7–14 & Ex. C]; Hr'g Tr. 162:8–163:8 (Feb. 7, 2020).  Then, between August and December 2018, the record indicates that the Debtor also financed the purchase of new trucks and equipment from certain lenders, granting them security interests in those trucks to serve as collateral for repayment of the debt.[2]  [ECF Doc. 64, ¶¶ 6–7, 17; ECF Doc. 114, ¶¶ 1–5]; Hr'g Tr. 163:9–164:10 (Feb. 7, 2020).  George Ackel, the 100% shareholder of Ackel Enterprises, Inc., the holding company that wholly owns the Debtor, personally and on behalf of Ackel Construction, executed unconditional guaranties for the repayment of the Notes to the secured lenders on the new trucks and equipment acquired by the Debtor.  *See* Hr'g Tr. 163:9–17; 164:4–8 (Feb. 7, 2020).

---

[2]   And according to George Ackel, another of his related companies, Extreme Motorsports, purchased equipment and vehicles at auction and transferred the titles of those assets to the Debtor prepetition.  *See* Hr'g Tr. 163:18–22 (Feb. 7, 2020).

No independent, third-party valuation of the trucks, trailers, and equipment owned by the Debtor has been provided in this case; however, based on the record and representations of counsel for the secured lenders and George Ackel, all seem to agree that each secured lender in this case is undersecured.[3]

### C.  The Debtor's Bankruptcy Filing

The Debtor filed its petition for chapter 11 bankruptcy relief on April 2, 2019, approximately nine months after assuming A & Brothers' debts to its secured lenders and less than six months after taking on new debt itself.   As an initial matter, the merger did not go smoothly. According to the Debtor:

> At the time of the merger, A Brothers had a fleet of trucks and other equipment recently acquired via financed transactions.  Generally, the Merger Agreement provided for an initial cash payment of $100,000 to the owner of A Brothers (Sufian Hamed), an additional $100,000 payment upon Fleetstar's refinance of A Brothers' various equipment financing obligations and for Mr. Hamed to receive a consulting agreement from Fleetstar.  Prior to Fleetstar completing the refinance of the various truck obligations, A Brothers' owner filed a lawsuit in the 24th Judicial District Court, styled *Sufian Hamed Versus Fleetstar, LLC*, No. 789-616 . . . pursuant to which Mr. Hamed essentially sought to unwind the merger.

[ECF Doc. 244, at 12].  Also according to the Debtor:  "Mr. Ackel and his companies have contributed hundreds of thousands of dollars to close the merger [with A & Brothers], to acquire equipment not originally owned by A Brothers and to otherwise capitalize the debtor[;] [i]nitially,

---

[3]     After the Debtor surrendered its collateral to Firestone Financial, LLC, pursuant to the *Agreed Order on Firestone Financial, LLC's Motion for Relief for Automatic Stay, or, in the Alternative, Motion To Compel Payment of Adequate Protection* dated July 22, 2019, [ECF Doc. 120], Firestone liquidated the collateral and amended its Proof of Claim to list an unsecured deficiency claim of $77,204.66, *see* Proof of Claim No. 5.  Although it is possible that some secured lenders will not hold similar deficiency claims, *see* Proof of Claim Nos. 7–9 & 11, without an independent, third-party valuation of the assets of the Debtor, and considering the statements in open court that the trucks and equipment are depreciating, *see* Hr'g Tr. 42:17–43:2; 50:23–24 (Feb. 7, 2020), the Court proceeds on the assumption that the lenders hold significant deficiency claims against the estate.  According to one lender, "I dare one creditor to tell you that they're oversecured.  My client is wildly undersecured right now."  Hr'g Tr. 42:21–23 (Feb. 7, 2020).

the Debtor's dispute with Mr. Hamed caused significant strain on the Debtor."  [ECF Doc. 244, at 13].

The Debtor also claimed that a primary reason it filed for bankruptcy centered on its dispute with Old River Leasing of Louisiana LLC ("Old River"), the only authorized Mack Truck dealer in the New Orleans metropolitan area.  The Debtor has alleged that pre- and post-petition, Old River refused to repair timely (or not at all) certain of the Debtor's trucks under manufacturer's warranty.  [ECF Doc. 145; ECF Doc. 244, at 13].  The Debtor contends that "[d]ue to Old River's neglect and refusal to honor warranties sold to Fleetstar, Debtor lost job opportunities, incurred unnecessary expenses transporting trucks to other service locations and was forced to repair certain trucks in-house, which crippled operations."  [ECF Doc. 244, at 13].

### D.  Claims Against the Estate

The bar date to filing proofs of claim for non-governmental creditors in this case was September 5, 2019.  A review of the claims register reveals that eight of the Debtor's truck lenders have filed eleven proofs of claim, alleging secured claims in the aggregate amount of approximately $2 million.  *See* Proof of Claim Nos. 1–4, 7–11.  As stated above, this Court anticipates the secured lenders will hold significant deficiency claims.  Additional creditors have each proofs of claim asserting unsecured claims:

(i)     Old River, the counterparty to the Debtor's adversary concerning Old River's alleged failure to repair the Debtor's trucks under warranty, and also a lessor of trucks to the Debtor, has asserted an unsecured claim of $300,030.42 for "unpaid lease payments, vehicle damages, and fines," *see* Proof of Claim No. 13;[4]

(ii)    Old River of New Orleans, LLC, has asserted an unsecured claim of $4,106.88 for "goods sold and services performed," *see* Proof of Claim No. 12;

(iii)   Hamed, Ibrahim Mustafa Hamed, and Mohammed MH Hamed have each asserted unsecured claims for $152,500, for a total of $457,500 in unsecured claims against

---

[4]     Old River also asserts that some portion of its claim is entitled to priority status under § 507(a).

the estate, presumably related to the merger with A & Brothers, *see* Proof of Claim Nos. 14, 15 & 18; and

(iv) Insiders George Ackel and Ackel Construction filed proofs of claim alleging unsecured debts against the estate, each for the amount of $247,567.00 for "money loaned," *see* Proof of Claim Nos. 16 & 17.[5]

### E. The Debtor's Post-Petition Activity

The Debtor's assets listed on Schedule A consist of approximately $4 million in equipment and vehicles, $3500 in deposits, and $271.93 in cash. [ECF Doc. 38]. The Debtor also listed three lawsuits, but asserted each is of "unknown" value: (i) a Lemon lawsuit versus Ford Motor Credit; (ii) claims against Old River for breach of contract (the "Old River Lawsuit"); and (iii) claims against Hamed related to the prepetition merger with A & Brothers (the "Hamed Litigation").

A review of the docket reveals that, in addition to filing its Schedules and attending the meeting of creditors pursuant to 11 U.S.C. § 341 in May 2019, the Debtor's activities early in this case were limited to addressing numerous motions filed by secured lenders to terminate the automatic stay pursuant to 11 U.S.C. § 362(d). Over the first few months of the Debtor's bankruptcy, nine secured lenders filed motions to terminate the automatic stay for failure to service the debt on each of the various loans or pay adequate protection. [ECF Docs. 19, 31, 51, 53, 64, 83, 92, 95, 201].

On June 7, 2019, approximately two months into the case, the United States Trustee ("UST") filed the Motion To Dismiss or Convert, requesting an expedited hearing and alleging the following:

Fleetstar, LLC ("Debtor") has failed to comply with the administrative requirements of the Bankruptcy Code, filed materially inaccurate pleadings, and

---

[5] Another creditor, the law firm of Ricci Partners, made an appearance at the hearing on February 7, 2020, and claimed to have an unsecured claim against the estate in the amount of approximately $30,000 for prepetition legal services for representing the Debtor in a Lemon lawsuit; however, the claims register does not reflect the filing of a claim on behalf of that creditor. The Lemon lawsuit is listed as an asset on the Debtor's schedules. [ECF Doc. 38].

has no ability to confirm a Chapter 11 plan.  Most significantly, despite its possession of a fleet of over thirty-five vehicles, it has failed to provide proof of (i) commercial liability insurance, and (ii) proof of collision and liability insurance for fifteen of the trucks/trailers.  Debtor has not opened a debtor-in-possession account, has taken no steps to amend its materially deficient Schedules and Statement of Financial Affairs, and has failed to provide a simple tax form requested by the U.S. Trustee.  The Debtor's principal testified at the meeting of creditors that the Balance Sheet, Income Statement, and other statements provided to the U.S. Trustee are inaccurate.  Thus, parties are hamstrung from evaluating the Debtor's financial condition, as they cannot rely on the documents provided by the Debtor nor the documents filed into the record.

[ECF Doc. 67, at 1–2].  At the June 25, 2019 hearing on the Motion To Dismiss or Convert, the UST identified ongoing instances of the Debtor's failure to provide required information, such as proof of insurance on all vehicles and equipment owned by the Debtor and complete and accurate financial information.  The Debtor represented that a former employee had sabotaged the Debtor's books and records, and, therefore, requested additional time to access its financial records to update the UST and its creditors with accurate information.  The Court continued the hearing on the Motion To Dismiss or Convert and reconvened the parties for a hearing on July 26, 2019.  [ECF Docs. 91 & 116].

Meanwhile, by the end of July 2019, the Debtor had either surrendered collateral trucks to certain lenders, [ECF Docs. 108 & 120], or had reached tentative agreements with lenders for monthly payment of adequate protection, [ECF Docs. 85,  107, 119, 175 & 256].[6]  As of July 3, 2019, the Debtor's monthly adequate protection payments to its lenders to begin in August totaled $33,000.  [ECF Doc. 103].  At the continued hearing on the UST's Motion To Dismiss or Convert on July 26, 2019, the UST reported lingering proof of insurance issues on trucks and trailers, issues

---

[6]  At least four of those lenders with whom the Debtor negotiated adequate protection payments have since filed motions to terminate the automatic stay for failure to pay adequate protection payments since September 2019. [ECF Docs. 239, 268, 300 & 309].  One of those creditors later withdrew its motion to terminate the automatic stay.  [ECF Doc. 306].  The Debtor negotiated a consent order with another of those creditors to lift the stay on the collateral securing repayment of the debt owed to that creditor.  [ECF Doc. 324].

with the DIP account, and repeated material misstatements on the Debtor's amended Schedules and Statement of Financial Affairs ("SOFA")—which had only been filed the night before. Further, the Debtor filed its Monthly Operating Reports ("MORs") for April, May, and June the night before the hearing as well. [ECF Docs. 127, 128 & 129]. Those reports revealed that the Debtor generated no income and maintained a negative cash position for those three months, prompting the UST to ask how the Debtor planned to pay adequate protection payments to its secured lenders. The UST re-urged the relief sought in the Motion To Dismiss or Convert pursuant to 11 U.S.C. §§ 1112(b)(4)(A), (C), (F), and (H). After hearing arguments, the Court continued the matter.

On August 8, 2019, the parties again appeared before the Court on the UST's Motion To Dismiss or Convert, among other motions. The Debtor presented a pro forma financial statement that identified costs and revenues associated with each truck asset of the Debtor and estimated that the Debtor would be generating significant free cash flow within twelve weeks. [ECF Doc. 143]. But upon scrutiny by the Court and considering testimony provided by George Ackel, it became clear to the Court that the Debtor's estimates and assumptions were unrealistic, given the number of trucks that had been surrendered to certain lenders and the timing and extent of repairs needed on the remaining revenue-producing trucks. The Court concluded that, at best, the Debtor would net zero revenue and, at worst, the Debtor would have a negative cash position at the end of twelve weeks.

To be able to operate in the black, the Debtor's trucks required major and minor repairs to be completed quickly. The Debtor attributed the difficulty in getting repairs completed timely to its ongoing disputes with Old River. By mid-August 2019, the Court granted on an interim basis the Debtor's application to employ special counsel to pursue litigation against Old River, [ECF

10

Doc. 153], and the Debtor pursued injunctive relief against Old River, [ECF Docs. 145 & 156]. The Debtor continued to limp along, allegedly funded on an unsecured basis by George Ackel and/or Ackel Construction.[7]   On August 22, the Debtor filed its MOR for the month of July,

---

[7]       Because George Ackel has not provided this Court, the UST, and the creditors in this case with a proper accounting of pre- and post-petition transactions, it has been impossible to ascertain with any degree of certainty the sources and destinations of money flowing in and out of the Debtor's estate.    What the Court does know is this:  Both George Ackel and Ackel Construction have filed proofs of claim asserting unsecured prepetition claims against the debtor for "money loaned."  *See* Proof of Claim Nos. 16 & 17.  At the hearing on September 20, 2019, Debtor's counsel represented to the Court that George Ackel—not Ackel Construction—covered both pre- and post-petition the expenses owed by the Debtor pursuant to the informal operating agreement with Ackel Construction.  Later, counsel representing both George Ackel and Ackel Construction ("Ackel's Counsel") asserted that Ackel Construction holds prepetition unsecured and post-petition administrative expense claims for funding the Debtor's obligations during this case.  *See* Hr'g Tr. 29:3–11 (Feb. 7, 2020).  At the same hearing, Debtor's counsel also stated that Ackel Construction had funded the Debtor during the case.  *See* Hr'g Tr. 19:5–10 (Feb. 7, 2020).  But then George Ackel himself testified on February 7 that he personally funded the Debtor during the case, not Ackel Construction, *see* Hr'g Tr. 143:21–22 (Feb. 7, 2020).

The undersigned's term began on September 9, 2019, when this case was approximately five months' old.  Since then, George Ackel and his counsel have made multiple statements at various hearings that the Court "ordered" George Ackel to fund the case on an unsecured basis.  On July 3, 2019, the Debtor filed a motion for post-petition financing (the "DIP Motion"), in which the Debtor sought approval to grant super-priority administrative expense status to insider George Ackel in exchange for a loan of $100,000 to pay the Debtor's operating expenses, adequate protection payments to secured lenders, UST fees, and allowed administrative expense claims.  [ECF Doc. 98].  At the hearing on July 29, 2019, the previous judge made the following statement in analyzing the feasibility of the Debtor's business going forward:

> COURT:  I'm not doing it with a superpriority lien from the debtor's principal.  Because I'll tell you the truth.  My attitude about that is, saving of this company has more to do with the principal than it does with the creditors so I'm not going to put him ahead of other creditors. . . .

> COUNSEL:  But he's paying.  He's using the money to pay the adequate protection.

> COURT:  Yeah, but what about everyone else?  Because I could give back every one of these vehicles tomorrow and close it down and whatever's left is left.  And they would get that.  I don't have a liquidation analysis.  I don't have an analysis of what this is actually going to generate if we put a $100,000 superpriority on this case, particularly when it's an insider.  I don't just grant superpriority liens on this stuff without knowing a lot more about where this company is going in the future.

> . . . .

> COUNSEL:  . . . He might waive the superpriority.  He's trying, he's invested a million dollars probably already in this company . . . .

showing again no income and a negative cash position of $6143.  [ECF Doc. 159].   On October 9, 2019, the Debtor filed its MOR for the month of August, showing a negative cash position of $6156.  [ECF Doc. 211].  Also in October, the Debtor filed into the record the above-mentioned Hauling Agreement, which had been executed in September and purportedly memorialized in writing the relationship between Ackel Construction and the Debtor.  [ECF Docs. 178, 209 & 222]. The Court had requested the Hauling Services Agreement to be put in place as a first step to providing transparency regarding the transactions between the Debtor and an insider and related company, Ackel Construction, but, as discussed below, the goal of financial transparency was never achieved.

On October 23, 2019, the UST supplemented its Motion To Dismiss or Convert, informing the Court that the Debtor had failed to date to apprise the UST of the reasons for numerous and significant pre- and post-petition transfers from the Debtor to insiders and non-debtor affiliates of the Debtor, as required in completing the SOFA.  [ECF Doc. 224, ¶¶ 9–12].  The UST further observed that the Debtor's MORs for April through August 2019 reflected a total of $2600 in income, with $31,000 in adequate protection payments due monthly as of August 31, 2019 (some of which it had not made).  [ECF Doc. 224, ¶¶ 13–15 (citing ECF Doc. 217)].  The UST again

---

COURT:  So he's the one who has the most interest in putting in whatever it takes to make it live 'cause otherwise he waives everything.

Transcribed from the July 29, 2019 hearing (min. 34:25–35:30).

At a subsequent hearing on August 26, 2019, the previous judge observed on the record that the Debtor had yet to demonstrate that it could generate free cash flow and stated that she would not grant a motion which would give priority status to an insider of the Debtor; rather, the Court left the decision of whether to fund the company on an unsecured basis going forward to George Ackel. See Hr'g Tr. Aug. 26, 2019 (min. 45:22–46:10).  The Court, however, did not issue an order denying the DIP Motion and, therefore, that motion remains pending.  Other than those statements of the Court, the undersigned cannot find any statements or documents on the record that indicate that George Ackel has been ordered by this Court to fund the Debtor on an unsecured basis.

12

requested that the Debtor's case be converted pursuant to 11 U.S.C. § 1112(b)(4)(A) and (F) for failure to satisfy timely reporting requirements, and also for the fact that the Debtor's MORs reflected that it continued to earn negligible revenue, remained unable to meet its business obligations, and had yet to demonstrate its ability to generate free cash flow.  [ECF Doc. 224, ¶¶ 16–17, 20–23].

### F.  The Debtor's Disclosure Statement and Plan of Reorganization

Pursuant to 11 U.S.C. § 1121 and this Court's Order of April 4, 2019, [ECF Doc. 2], the Debtor's exclusivity period in which to file a plan of reorganization expired on July 31, 2019.  A subsequent Order of the Court gave the Debtor until September 9, 2019, to file a plan and disclosure statement.  [ECF Doc. 76].  The Debtor did not file a proposed disclosure statement and plan of reorganization until November 27, 2019.  [ECF Docs. 243 & 244].  The proposed plan is styled as a liquidating plan of sorts, whereby one of several potential auctioneers would be employed to auction the Debtor's truck assets with proceeds going to secured lenders, but not before the passage of a 45-day window in which George Ackel would have the opportunity to negotiate with lenders the acquisition or refinancing of collateral or to acquire unencumbered assets.  [ECF Doc. 244, at 7–8].  In the words of Debtor's counsel:  "What we're trying to do is minimize deficiencies in this case. . . .  Now with that we propose some provisions that arguably stretch the limits of the Bankruptcy Code.  For example, offering an insider an opportunity to acquire the assets at 80 percent."  Hr'g Tr. 11:17–23 (Jan. 22, 2020).  The proposed plan does not provide the opportunity for lenders to credit-bid their secured liens.  [ECF Doc. 243, at 19].  Lastly, the proposed plan provides that George Ackel will contribute $50,000 in exit-financing, which will be used only to pay allowed professional fees, in exchange for a release of all claims against

insiders—claims which the Debtor predictably asserts are worthless.  [ECF Doc. 243, at 14 & 17–18; ECF Doc. 244, at 7–8].

The proposed plan envisioned the emergence of a Reorganized Debtor, "revested with property of the Estate to the extent provided in the Plan, on or after the Effective Date."  [ECF Doc. 244, at 8].  "Plan Assets" and "Truck Assets" would be transferred to the Reorganized Debtor upon the Effective Date, free and clear of all liens, claims, and interests.  [ECF Doc. 243, at 30].  "Plan Assets" included, among other things, "all proceeds of Causes of Action."  [ECF Doc. 243, at 8].  The proposed plan included a boilerplate definition of "Causes of Action," [ECF Doc. 243, at 4–5]; neither the proposed disclosure statement or plan identified the Old River Lawsuit or the Hamed Litigation specifically, but the plan envisioned unsecured creditors to receive a *pro rata* share of the Plan Assets.  [ECF Doc. 243, at 16].  The proposed plan identified George Ackel as the manager of the Reorganized Debtor and specifically authorized him "to investigate, direct and compromise all retained Causes of Action."  [ECF Doc. 243, at 16].  No liquidation analysis was filed into the record.

The UST, six secured creditors, and one unsecured creditor filed oppositions to the Debtor's proposed disclosure statement.  [ECF Docs. 265, 274, 278, 280, 281, 284, 285 & 286].  Generally, those objections addressed the adequacy of information regarding the Debtor's current and future assets, the valuation of those assets, the liquidation of those assets, and the expected recovery to each creditor under the plan sufficient to allow each creditor to make an informed judgment regarding whether to accept or reject the proposed plan.  The objections also addressed the failure of the Debtor to provide a liquidation analysis as well as the estimated total amount of claims in each class and the projected plan payments to each class.  Finally, various objections alleged that the proposed disclosure statement and plan contain improper third-party releases and

14

discharge/injunction language and propose to violate the absolute priority rule by allowing equity to retain its interest post-confirmation.

Contemporaneously with the filing of its objection to the disclosure statement, the UST supplemented its Motion To Dismiss or Convert, asserting, among other things, that the Debtor's proposed plan is unconfirmable on its face. [ECF Doc. 282, ¶¶ 4 & 9]. The UST noted that the Debtor chronically filed MORs months late and reiterated that the Debtor had still not disclosed financial information to the UST and creditors. *Id.* ¶¶ 6–7. "Not only has the Debtor failed to disclose all payments, distributions, or withdrawals given to insiders within one year of the Petition Date (as required by Statement of Financial Affairs #30), Debtor now seeks to waive any potential collection actions against said insiders via the proposed Chapter 11 Plan." *Id.* ¶ 6.

### G. The Evidentiary Hearing on the UST's Motion To Dismiss or Convert

At the request of all of the parties, the Court did not hold a hearing on the UST's Motion To Dismiss or Convert until January 22, 2020, to coincide with the hearing on the adequacy of the Debtor's proposed disclosure statement. In light of numerous concerns with the progression of this bankruptcy case since its inception, the Court elected to hear argument and testimony on the UST's Motion To Dismiss or Convert before it would consider other matters. Over the course of the multi-day hearing, the Court heard testimony from the Debtor's outside accountant and George Ackel, and considered arguments and exhibits provided by the parties.

On December 10, 2019, the Debtor had filed into the record revised MORs for the months of April through August, [ECF Docs. 245, 246, 247, 249 & 250], as well as its MORs for the months of July through October 2019, [ECF Docs. 249–252]. On January 21, 2020, the day before the scheduled hearing on the adequacy of the Debtor's proposed disclosure statement, the Debtor filed its MORs for the months of November and December 2019. [ECF Docs. 292 & 293]. To

date, the Debtor has not filed MORs for January or February 2020. According to the Debtor's MORs and the testimony given on January 22, 2020 by the Debtor's accountant hired in this case, the Debtor has never generated free cash flow since the Petition Date. *See* Hr'g Tr. 52:15–6 (Jan. 22, 2020).

But also concerning was the accountant's testimony that, in completing the MORs, he "didn't validate the revenue or expenses," and "just prepared the MORs, based on the information [he] was given." Hr'g Tr. 32:25–33:1; 54:11–12 (Jan. 22, 2020). The accountant testified that all information used in preparing the MORs came from George Ackel, with the exception of bank statements. *See* Hr'g Tr. 27:15–20 (Jan. 22, 2020). He also testified that, in this case, the reconciliation of the bank statements was performed by Ackel Construction's staff. *See* Hr'g Tr. 31:22–32:1–7 (Jan. 22, 2020).

The accountant also testified about a demonstrative presented by the Debtor purporting to detail the "due-to" and "due-from" amounts among the Debtor, Ackel Construction, and other related entities that he said he helped prepare for the UST. Hr'g Tr. 69:23–70:4 (Jan. 22, 2020). In the end, the accountant revealed that the sources of the information contained in the demonstrative were QuickBooks entries from Ackel Construction that he did not make and did not verify through comparison with Ackel Construction bank statements. *See* Hr'g Tr. 83:7–86:25 (Jan. 22, 2020).

Because of the lateness of the hour, the Court adjourned the hearing and scheduled the hearing to reconvene on January 29, 2020. On January 29, the Debtor informed the Court that it had proposed terms for a structured dismissal of the case and requested time to negotiate with all of its creditors. At the request of the parties, the Court adjourned the hearing on the UST's Motion To Dismiss or Convert until February 7, 2020.

16

On February 7, the UST informed the Court that terms for a structured dismissal could not be reached unanimously among the creditors, but the parties agreed that the case could not remain in chapter 11 in light of the testimony from the Debtor's accountant that the Debtor was losing money, as well as the December MOR showing a negative cash position and that no adequate protection payments had been made to any secured creditor. Hr'g Tr. 8:17–9:10 (Feb. 7, 2020). Although the UST reported that the parties "are all on board that there's cause for dismissal or conversion under 1112(b)," Hr'g Tr. 8:19–20 (Feb. 7, 2020), the Debtor stated that it "didn't necessarily concede that this case could not proceed as a Chapter 11 [but had] reached an agreement with the primary, most vocal persons, which would be the U.S. Trustee and Midland Financial that we will accept a dismissal," Hr.g Tr. 11:15–18 (Feb. 7, 2020).

Accordingly, the arguments presented and testimony elicited at the February 7 hearing focused on whether this Court should dismiss or convert the case under 11 U.S.C. § 1112(b) in the "best interests of creditors and the estate." The Debtor pressed its case for dismissal over conversion. The Debtor asserted that dismissal is in the best interests of creditors, defining "creditors" to include not only secured creditors, but also insiders George Ackel and Ackel Construction, who have asserted prepetition unsecured claims against the Debtor and intend to assert significant administrative expense claims against the estate pursuant to their contributions under the Hauling Services Agreement, as well as professionals of the estate who are also administrative expense claimants. *See* Hr'g Tr. 11:19–16, 12:1–16, 14:3–13, 19:13–17, 20:14–24 (Feb. 7, 2020) (estimating the purported insider administrative expense claims to be approximately $100,000 and the professional fees accrued to be approximately $100,000).[8] With those claims

---

[8]     But an evaluation of what is in the best interests of creditors under § 1112(b)(1) arguably does not require this Court to consider the interests of administrative expense claimants. *See In re Acme Cake Co.*, 495 B.R. 212, 217 (Bankr. E.D.N.Y. 2010) ("The Court noted that the interests of administrative claimants were not being considered, because § 1112(b) limits the Court's consideration to the interests of creditors

against the estate, the Debtor argued that the case would be rendered administratively insolvent and inappropriate for conversion. *See* Hr'g Tr. & 20:14–24 (Feb. 7, 2020).

Even though the parties had informed the Court that unanimous consensus on terms for a structured dismissal could not be reached, the Debtor, together with Midland States Bank, the most vocal secured lender in this case, advocated for a "dismissal order with terms."  Hr'g Tr. 50:18–21 (Feb. 7, 2020); *see also* Hr'g Tr. 11:11–14 (Feb. 7, 2020).  The Debtor urged the Court to dismiss this case with the following terms:

- The Debtor would be prohibited from refiling for bankruptcy relief for twelve months from the date of the dismissal order;

- Any insider or other person or entity receiving assets of the Debtor with a value exceeding $100 (other than by order of this Court) would be prohibited from filing for bankruptcy relief for nine months from the date of the dismissal order;

- Fleetstar would surrender collateral to any lender whose claim had not been paid in full or "is not the subject of a written satisfaction or agreement with the applicable secured creditor," and secured lenders would be free to exercise their state law rights to seek any deficiency balance owed;

- Within thirty days of the entry of the dismissal order, Fleetstar would file with the UST all required reports indicating the amount of disbursements made and pay the UST quarterly fees or make arrangements to pay such fees; and

- Fleetstar's bankruptcy case would not be closed before March 31, 2020, with this Court retaining jurisdiction to enforce its dismissal order.

[ECF Doc. 317-1].

In support of its case for dismissal, the Debtor called upon George Ackel to testify; the substance of that testimony is discussed further below.  Two non-insider unsecured creditors, Hamed and Old River, both objected to the proposed structured dismissal and favored conversion.

---

and the estate, and holders of administrative claims, with certain exceptions not relevant here, are not creditors as defined in § 101(10).  Section 1112(b) does not require the Court to consider the best interest of all parties in interest.").

*See* Hr'g Tr. 32:10–24, 69:10–71:4 (Feb. 7, 2020); [ECF Docs. 314, 318].[9]  One secured lender also supported conversion to chapter 7, citing the need for a "trustworthy" chapter 7 trustee. *See* Hr'g Tr. 59:1–15 (Feb. 7, 2020).  And at least two secured creditors acknowledged some benefit to conversion, recognizing that with either a traditional dismissal or the proposed structured dismissal, their clients would be required to initiate state court proceedings to, at a minimum, recover the deficiency claim they hold; therefore, they each maintained an ambivalent position, favoring "whatever result gets us our collateral surrendered, preserving our right to take our deficiency without filing a new lawsuit." Hr'g Tr. 54:3–55:3; 55:13–56:7 (Feb. 7, 2020).

---

[9]      The proponents of the Debtor's proposed structured dismissal concede that "[i]t's not fully agreed to by all of the parties," Hr'g Tr. 50:20–21 (Feb. 7, 2020), but in arguing that dismissal is nevertheless in the best interests of creditors, Debtor's counsel assured the Court that "the **bona fide** creditors and the UST either took no position or requested that the case be dismissed with restrictions outlined in the proposed order." [ECF Doc. 317] (emphasis added).  The Debtor appears to ask this Court to limit its consideration of the "best interests of creditors" to only "bona fide" creditors, which, in the Debtor's view, are the secured creditors, insiders, and administrative expense claimants in this case.  To that end, Debtor's counsel challenged the legitimacy or sincerity of the non-insider unsecured creditors, stating that they are "not truly creditors" because they are the "targets of litigation."  Hr'g Tr. 21:6–10 (Feb. 7, 2020).  According to the Debtor in its post-trial brief:

> The only parties pressing for conversion are Old River and Sufian Hamed.  **First, they have no claim or no viable claim.**  Fleetstar has significant claims against Hamed.  Old River caused the demise of Fleetstar and is the target of the lawsuit that may be the largest asset of this estate.  Clearly their goal is to deal with a chapter 7 trustee who may be forced to settle quickly for a *de minimus* amount.  If creditors which did not have a claim against them were concerned about disposition of assets, they would have sought conversion; **no such true creditor** sought conversion.

[ECF Doc. 317, ¶ 3] (emphasis added).  But the plain text of § 1112(b) simply instructs this Court to consider the "best interests of creditors and the estate."  "Creditors" is defined in the Bankruptcy Code, in pertinent part, as an "entity that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor."  11 U.S.C. § 101(10)(A).  And "claim" is defined broadly in the Code to include any "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured."  11 U.S.C. § 101(5)(A).  The non-insider unsecured creditors' claims may be unliquidated and disputed, but they are "claims" nonetheless and must be considered by this Court in evaluating whether dismissal or conversion is in the best interests of creditors and the estate.

At the close of the hearing, the Court took the matter under advisement to consider the full record in deciding whether conversion or dismissal is in the best interests of creditors and the estate.

## CONCLUSIONS OF LAW

### A. Legal Standards for Conversion or Dismissal of a Chapter 11 Case

Section 1112 permits a party in interest to move to convert or dismiss a chapter 11 debtor's case for "cause." *See* 11 U.S.C. § 1112(b). The Bankruptcy Code does not expressly define "cause," but does set forth a non-exhaustive list of examples of events that may constitute cause, including "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation," "unexcused failure to satisfy timely any filing or reporting requirement established by this title or by any rule applicable to a case under this chapter," and "failure timely to provide information or attend meetings reasonably requested by the United States trustee." *Id*. § 1112(b)(4)(A), (F) & (H). "Although section 1112(b)(4) does not list administrative insolvency as a cause to convert or dismiss a chapter 11 case, a court may still consider this factor." *In re BH S & B Holdings, LLC*, 439 B.R. 342, 349 (Bankr. S.D.N.Y. 2010) (citations omitted).

Based on the record, including the testimony of the Debtor's accountant on January 22, 2020, this Court finds cause exists to convert or dismiss the Debtor's case. The Debtor has filed its MORs consistently late or not at all and the Debtor has yet to provide accurate and complete financial information regarding pre- and post-petition transactions among the Debtor and related companies reasonably requested by the UST. The Debtor is not operating and has no income— although the lack of transparency to date regarding the relationship of the Debtor to insiders and related companies surely contributes to and influences that condition. And certainly, if this case

20

were to be allowed to continue in chapter 11, the amount of unpaid professional fees would continue to grow, increasing the amount of administrative expense claims against the estate.

### B. Factors To Consider in Determining Whether Dismissal or Conversion Better Serves the Interests of Creditors and the Estate

"Once cause is established under § 1112(b), a court must either dismiss the case or convert it to chapter 7." *In re Babayoff*, 445 B.R. 64, 81 (Bankr. E.D.N.Y. 2011). "There is no bright-line test to determine whether conversion or dismissal is in the best interest of creditors and the estate." *Id.* (internal punctuation and citations omitted). The decision between those two remedies is left to the "wide" discretion of the Court. *In re Koerner*, 800 F.2d 1358, 1367 (5th Cir. 1986) (citing S. REP. NO. 989, 95th Cong., 2d Sess. 117 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5903); *see also In re Delta AG Grp.*, 596 B.R. 186, 200–01 (Bankr. W.D. La. 2019) (citing *In re Del Monico*, No. 04-B-28235, 2005 WL 1129774, at \*3 (Bankr. N.D. Ill. May 13, 2005)).

The phrase "best interests of creditors and the estate" is not defined expressly in the Bankruptcy Code. And although courts generally accommodate the parties' choice when they all agree upon one course of action over the other, the test for what is in the "best interests of creditors and the estate" is not one of majority rule. *See Rollex Corp. v. Associated Materials, Inc. (In re Superior Siding & Window, Inc.)*, 14 F.3d 240, 243 (4th Cir. 1994) (observing that the "best interest of creditors" test is "not served by merely tallying the votes of . . . creditors and yielding to the majority interest"). Therefore, "[w]hen parties disagree on conversion or dismissal, as they do here, the court evaluates the alternatives, and chooses the alternative that would be most advantageous to the estate as a whole." *In re Hampton Hotel Investors, L.P.*, 270 B.R. 346, 359 (Bankr. S.D.N.Y. 2001). To do that, courts have considered multiple factors to determine whether conversion or dismissal better serves the interests of creditors and the estate, including:

1. Whether some creditors received preferential payments, and whether equality of distribution would be better served by conversion rather than dismissal.

2. Whether there would be a loss of rights granted in the case if it were dismissed rather than converted.

3. Whether the debtor would simply file a further case upon dismissal.

4. The ability of the trustee in a chapter 7 case to reach assets for the benefit of creditors.

5. In assessing the interest of the estate, whether conversion or dismissal would maximize the estate's value as an economic enterprise.

6. Whether any remaining issues would be better resolved outside the bankruptcy forum.

7. Whether the estate consists of a "single asset."

8. Whether the debtor had engaged in misconduct and whether creditors are in need of a chapter 7 case to protect their interests.

9. Whether a plan has been confirmed and whether any property remains in the estate to be administered.

10. Whether the appointment of a trustee is desirable to supervise the estate and address possible environmental and safety concerns.

*In re BH S & B Holdings, LLC*, 439 B.R. at 346–47 (citing 7 COLLIER ON BANKRUPTCY

¶ 1112.04[7] (Richard Levin & Henry J. Sommer eds., 16th ed.)); *see also In re Babayoff*, 445

B.R. at 81–82 (same).  "Essentially, the above factors help the court compare how creditors fare

inside, as opposed to outside, bankruptcy."  *In re Green Box NA Green Bay, LLC*, 579 B.R. 504,

511 (Bankr. E.D. Wis. 2017) (citing *In re Helmers*, 361 B.R. 190, 197 (Bankr. D. Kan. 2007)).

"So, a key question the court must ask is:  what assets would be available for a chapter 7 trustee to

liquidate and administer for the benefit of unsecured creditors if this case were converted?"  *Id*.

But the text of § 1112(b) not only requires this Court to convert or dismiss the case based

on the best interests of creditors—the Code also requires the Court to consider the best interests of

the estate.  *See* 11 U.S.C. § 1112(b)(1).  This Court agrees with other courts and "is of the view that protecting the best interests of the estate includes protecting the bankruptcy process under which the estate is administered."  *In re Capra*, No. 19-B-15935, 2020 WL 465739, at *7 (Bankr. N.D. Ill. Jan. 28, 2020).

### C. The Debtor's Proposed Dismissal Is Not In the Best Interests of Creditors and the Estate and Is Prohibited by *Jevic* to the Extent It Proposes Distributions Outside of the Code's Absolute Priority Scheme

"A dismissal typically 'revests the property of the estate in the entity in which such property was vested immediately before the commencement of the case'—in other words, it aims to return to the prepetition financial status quo."  *Czyzewski v. Jevic Holding Corp.*, 137 S.Ct. 973, 979 (2017) (quoting 11 U.S.C. § 349(b)(3)); *see also* H.R. REP. No. 595, 95th Cong., 1st Sess. 338 (1977) (stating that dismissal is intended to "undo the Bankruptcy case, as far as practicable, and to restore all property rights to the position in which they were found at the commencement of the case").  A structured dismissal, though, is a "hybrid dismissal and confirmation order" that alters a chapter 11 dismissal's ordinary restorative consequences, or which has other special conditions attached, such as "approving certain distributions to creditors, granting certain third-party releases, enjoining certain conduct by creditors, and not necessarily vacating orders or unwinding transactions undertaken during the case."  *Jevic Holding Corp.*, 137 S.Ct. at 979 (quoting AM. BANKR. INST. COMM'N TO STUDY REFORM OF CHAPTER 11, 2012–2014 FINAL REPORT AND RECOMMENDATIONS 270 (2014)).  Other bells and whistles that have been featured in structured dismissals include retention of jurisdiction, claims-reconciliation mechanisms, and gifts from senior claim holders to junior claim holders who might otherwise not be entitled to such recovery.

Structured dismissals "can have the effect of avoiding the procedural and substantive requirements involved in prosecuting a chapter 11 plan, [and] therefore have . . . 'emerged as a

cost-effective exit strategy from Chapter 11 bankruptcy.'" *In re Positron Corp.*, 556 B.R. 291, 294 (Bankr. N.D. Tex. 2016) (quoting Richard A. Bixter, Jr., *Structured Dismissals: Saving Time and Money in Corporate Bankruptcy*, J. OF BANKR. L. 2016.06-3 (2016)). "[W]hile not expressly provided for in the Code, a structured dismissal may be an appropriate resolution to a case where the process includes sufficient guarantees that fundamental rules and principles governing the administration and distribution of estate assets are upheld." *In re Biolitec, Inc.*, 528 B.R. 261, 269 (Bankr. D.N.J. 2014) (citing *In re Buffet Partners, L.P.*, No. 14-30699-HDH-11, 2014 WL 3735804, at *3 (Bankr. N.D. Tex. 2014)). "And they have curried favor with some courts because they facilitate efficient case resolutions and often represent the least bad alterative when neither confirmation nor conversion to chapter 7 would benefit creditors." *In re Positron Corp.*, 556 B.R. at 295 (internal quotations and citations omitted). But there are limits to their use. The United States Supreme Court recently held in *Jevic* that a structured dismissal is not a permissible means for ending a chapter 11 case if (i) distributions do not follow the Bankruptcy Code's priority scheme and (ii) the affected creditors do not consent. 137 S.Ct. at 983–84.

Here, the Debtor's proposed dismissal scheme envisions the Debtor "approving certain distributions" to secured lenders (*i.e.*, surrendering collateral), although no information is available regarding the value of the trucks and the amount of the deficiency claim each secured lender will wind up holding. It "enjoin[s] certain conduct by creditors" (*i.e.*, prohibits entities that receive property of the estate from filing for bankruptcy relief for a period of time); and it contains a jurisdiction-retention provision. Therefore, to the extent the Debtor's proposed "dismissal order with terms" seeks to depart from the "restorative consequences" of § 349 and does not return all parties to the "prepetition status quo," it is a structured dismissal, albeit a thin one. It is actually the result of a deal or settlement offered by the Debtor to its secured lenders in the hope that none

would advocate for conversion over dismissal.  *See* Hr'g Tr. 47:23–51:3 (Feb. 7, 2020) ("[W]e don't have unanimity for the two unsecured creditors so we do understand evidence [regarding dismissal versus conversion] has to be put on today . . . . [W]e wanted to put terms though, that at least all of the secured creditors—that none of them will oppose dismissal now.").  Because it is a deal struck solely to appease secured creditors, the unsecured creditors were not at the negotiating table, *see* Hr'g Tr. 35:13–16, 36:8–14 (Feb. 7, 2020).  As a consequence, the proposed structured dismissal order/settlement is silent on what happens to remaining assets of the estate not encumbered by secured creditors' liens.[10]

The Debtor's unencumbered assets include, at a minimum, certain trucks and equipment, as well as the Old River Lawsuit, the Hamed Litigation, and the Lemon lawsuit.  Although the Debtor valued all three causes of action it possesses as "unknown" on its Schedules, it has come to light over the course of the hearings in this case that the Debtor's principal, George Ackel, believes the Old River Lawsuit to be valued at $1 million or more.  *See*, *e.g.*,  Hr'g Tr. 12:16–18 (Jan. 22, 2020) (identifying the Old River Lawsuit as "the primary asset for unsecured creditors");

---

[10]     The Debtor and those secured lenders who negotiated the terms of the proposed settlement did not ask this Court to approve the settlement under Bankruptcy Rule 9019.   To the extent that the proposed settlement would affect the rights of non-settling parties and is determinative of the outcome of this case, this Court would be nonetheless obligated to consider the best interests of all creditors in addition to the fairness of the settlement to the settling parties.  *See In re Masters Mates & Pilots Pension Plan & IRAP Litig.*, 957 F.2d 1020, 1026 (2d Cir. 1992) ("Where the rights of one who is not a party to a settlement are at stake, the fairness of the settlement to the settling parties is not enough to earn the judicial stamp of approval . . . . [I]f third parties complain to a judge that a decree will be inequitable because it will harm them unjustly, he cannot just brush their complaints aside."); *In re Miami Metals I, Inc.*, 603 B.R. 531 (Bankr. S.D.N.Y. 2019) ("[W]hen the rights of non-settling parties are implicated by the terms of a settlement, the court cannot approve it without considering the interests of those non-settling parties." (quoting *Stanwich Fin. Servs. Corp. v. Pardee (In re Stanwich Fin. Servs. Corp.)*, 377 B.R. 432, 437 (Bankr. D. Conn. 2007)); *In re Biolitec, Inc.*, 528 B.R. at 267 (Bankr. D.N.J. 2014) ("Because the Trustee's Motion seeks to combine the proposed settlement with a dismissal of the case, its reasonableness cannot be evaluated without analyzing and considering the effect of dismissal on all parties.").

[ECF Doc. 317] (referring to the Old River Lawsuit as "the largest asset of this estate").[11] The long and the short of the Debtor's argument for dismissal is that "Ackel Construction and Mr. Ackel don't want to lose this valuable lawsuit." *See* Hr'g Tr. 14:16–17 (Feb. 7, 2020); *see also* Hr'g Tr. 141:6–13 (Jan. 22, 2020) (Ackel stating his "intention was to recoup the millions of dollars" he has invested in his companies with proceeds from the Old River Lawsuit). Indeed, George Ackel doesn't distinguish between himself personally and the Debtor—and believes that the appointment of a trustee if this case were converted would mean that the Old River Lawsuit would no longer be under his control. *See* Hr'g 143:18–19 (Feb. 7, 2020). And he went as far as to threaten to withhold his cooperation in the litigation of the Old River Lawsuit if the case were converted to one under chapter 7, which, in his view, would reduce considerably the value of that asset of the estate. *See* Hr'g Tr. 133:21–135:25 (Feb. 7, 2020); Hr'g Tr. 22:23–23:1 (Feb. 7, 2020) ("And at the end of the day, it's going to be a struggle for a Trustee without Mr. Ackel's cooperation to recover enough to even pay the Chapter 11 administrative expenses."). George Ackel is correct that if this case were to be dismissed, the Old River Lawsuit and other unencumbered assets of the estate continue to vest with Fleetstar—of which he is the 100% owner. Because George Ackel is the equity holder as well as an unsecured creditor of the Debtor, having filed a proof of claim against the estate, it appears that dismissal of this case would result in distributions that do not follow the Bankruptcy Code's priority scheme.[12] George Ackel's

---

[11]     At this time, the Court does not need to determine the merits or estimate the value of the Old River Lawsuit. "[M]ost cases reject the need to evaluate the merits of a debtor's litigation claims in deciding whether to dismiss or convert a chapter 11 case." *In re FRGR Managing Member LLC*, 419 B.R. 576, 582 (Bankr. S.D.N.Y. 2009); *see also In re BH S & B Holdings, LLC*, 439 B.R. at 350–51; *In re Ameribuild Constr. Mgmt., Inc.*, 399 B.R. 129, 134 (Bankr. S.D.N.Y. 2009).

[12]     The absolute priority rule has its roots in the pre-Bankruptcy Code "fair and equitable" standard for confirming a plan of reorganization. *See Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 444 (1999). "The reason for such a limitation was the danger inherent in any reorganization plan proposed by a debtor, then and now, that the plan will simply turn out to be too good a deal for the debtor's owners." *Id.* (citing H.R. DOC. No. 93-137, pt. I, p. 255 (1973)). "Hence the pre-Code

testimony also revealed that, if the case is dismissed, he plans to conduct an out-of-court claims-reconciliation process himself, deciding who has "valid" claims and whether to pay them with any proceeds resulting from the Old River Lawsuit.  *See* Hr'g Tr. 141:6–143:3 (Feb. 7, 2020).

The facts here are not unlike those in *In re Biolitec, Inc.*, a case in which the chapter 11 trustee filed a motion to approve a settlement agreement with one major creditor under Bankruptcy Rule 9019 and to dismiss the debtor's case "subject to a number of conditions."  528 B.R. 261, 265 (Bankr. D.N.J. 2014).  Those conditions included the transfer of most of the estate's assets, including causes of action, to a liquidating trust for liquidation by a trustee "whose actions are subject to the direction or consent of [a major unsecured creditor]."  *Id*. at 271.  In considering the best interests of creditors, the *Biolitec* court had this to say regarding that sort of arrangement:

> In effect, the proposal would result in the Trustee's statutory duties being assumed by [the major unsecured creditor].  Aside from the lack of authority for turning control over the administration of estate assets to a creditor, absent plan confirmation, it is not clear how the interests of all creditors would be served by a claims resolution process subject to the control of an unsecured creditor whose interests are in direct conflict with other claimants.  **Even if dismissing the case and avoiding administrative expenses associated with liquidating the estate would result in a greater pool of assets for distribution, this benefit might well be outweighed by the burden placed on creditors to prove their claims and the possibility of additional litigation in connection with an uncertain claims resolution and distribution process.**  For obvious reasons, the interests of the creditor body as a whole are likely better served by the bankruptcy process, where claims are entitled to prima facie validity and the resolution of disputed claims is overseen by a disinterested chapter 7 trustee and the court.

*Id*. (emphasis added).

---

judicial response known as the absolute priority rule, that fairness and equity required that 'the creditors . . be paid before the stockholders could retain [equity interests] for any purpose whatever."  *Id*. (citing *N. Pac. Ry. Co. v. Boyd*, 228 U.S. 482, 508 (1913)).  One of the primary reasons that the *Jevic* Court closed the gap regarding the applicable priority rules that govern distribution of assets when a case ends in a structured dismissal was to maintain the predictability and protections that the absolute priority rule provides creditors.  *See Jevic Holding Corp*., 137 S.Ct. at 986–87.

The court's reasoning in *Biolitec* applies here.  If this case is dismissed as requested by the Debtor, George Ackel, equity owner and unsecured creditor of the Debtor, retains control over the Old River Lawsuit, the most valuable asset of the estate, along with all other unencumbered assets, over all other unsecured creditors—including the secured lenders with their deficiency claims and the estate professionals.[13]  And creditors would then be forced to trust the claims-reconciliation process as well to George Ackel, an insider who is not subject to the duties and requirements of the Bankruptcy Code—and who holds competing claims with the Debtor's creditors.  Indeed, the plain terms of the structured dismissal/settlement agreement proposed by the Debtor contemplate secured creditors—whose claims enjoy *prima facie* validity now—having to spend additional time and significant expense to chase the Debtor's assets through state courts and prove their deficiency claims.  [ECF Doc. 317-1].  This, after the Debtor has spent almost a year in bankruptcy, used the lender's trucks, and paid little, if any, adequate protection to the lenders.  "All creditors are entitled to a fair opportunity to recover on their claims, but engaging in litigation in multiple forums— unreviewed by a fiduciary whose primary obligation is to the estate and to its creditors—is not the best way to achieve and maximize creditor recoveries."  *In re FRGR Managing Member LLC*, 419 B.R. 576, 579–80 (Bankr. S.D.N.Y. 2009).

Further, the terms of the structured dismissal/settlement agreement ask this Court to preemptively bar **any** party who receives any of the Debtor's property worth more than $100 from

---

[13]    When a chapter 11 case is converted to one under chapter 7, administrative expenses incurred during the chapter 11 case are afforded a lower priority than administrative expenses incurred during the chapter 7 case.  *See* 11 U.S.C. § 726(b).  "The result is that in cases converted from chapter 11 to chapter 7, chapter 7 administrative claimants are paid first, and chapter 11 administrative claimants share in any remaining distributions pro rata."  *In re Headless Mgmt. Corp.*, 519 B.R. 452, 456 (Bankr. S.D.N.Y. 2014). At least professionals' claims do retain their priority over unsecured claims after conversion, which is not so when a case is dismissed.  "Unless the court, for cause, orders otherwise, a dismissal of a case . . . revests the property of the estate in the entity in which the property was vested immediately before the commencement of the case," 11 U.S.C. § 349(b)(3), meaning that if this case were dismissed, the Debtor's professionals would be forced to collect their fees using state law collection methods.

filing for bankruptcy relief within nine months of the date of the order of dismissal. *Id.* Without a showing of abuse of the bankruptcy process by those entities or consent of the affected entities (who cannot even be identified at this time), that action would be an improper exercise of this Court's § 105(a) powers.    Even if the Debtor's proposed dismissal scheme could pass a "practicality" test, "it must be denied because [it] seeks to alter parties' rights without their consent and lacks many of the Code's most important safeguards." *In re Biolitec, Inc*., 528 B.R. at 269.

The decision whether to convert or dismiss is left to the discretion of the Court under § 1112(b).  Interpreting the Debtor's structured dismissal proposal to include not only the written terms of the settlement between the Debtor and some of its secured lenders, but also the oral testimony of George Ackel and the arguments of counsel to fill in the gaps of the proposal regarding distribution of assets and a claims-reconciliation process, for the reasons above, this Court finds that it is not in the best interests of creditors or the estate.  Further, to the extent the proposed "dismissal with terms" provides for distributions that disturb the absolute priority rule designated in the Bankruptcy Code without the consent of all affected creditors, this Court is prohibited by the Supreme Court's holding in *Jevic* from approving such proposal.

### D.  Conversion of this Case Is In the Best Interests of Creditors and the Estate

That said, even if the Court were to interpret the Debtor's proposal to consist of a settlement providing for surrender of certain collateral trucks to secured lenders followed separately by a more traditional dismissal under § 349, this Court finds that, in addition to the reasons above, it is in the best interests of creditors and the estate—which "includes protecting the bankruptcy process under which the estate is administered"—to convert this case to one under chapter 7. *In re Capra*, 2020 WL 465739, at *7.

As the Supreme Court has observed, "bankruptcy causes fundamental changes in the nature of corporate relationships[;] [o]ne of the painful facts of bankruptcy is that the interests of shareholders become subordinated to the interests of creditors." *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 355 (1985). When "a debtor remains in possession—that is, if a trustee is not appointed—the debtor's directors bear essentially the same fiduciary obligation to creditors and shareholders as would the trustee for a debtor out of possession," that is, "th[e] obligation to treat all parties, not merely shareholders, fairly." *Id*. at 355–56. As part of that fiduciary obligation, "the debtor is obligated to protect and conserve property in its possession, as well as to provide voluntary and honest disclosure of financial information—a reasonable '*quid pro quo*' for its temporary relief from substantial financial obligations." *In re Sal Caruso Cheese, Inc.*, 107 B.R. 808, 817 (Bankr. N.D.N.Y. 1989) (citations omitted). Indeed, "[t]he debtor-in-possession is viewed as a separate legal entity from the pre-petition debtor and is empowered to take all steps necessary to solve the problems created by the debtor's operation of the business in the past." *In re Chateaugay Corp.*, 102 B.R. 335, 354 (Bankr. S.D.N.Y. 1989) (internal quotations and citations omitted).

It has become clear to this Court that George Ackel neither views the Debtor as a separate legal entity from the prepetition Fleetstar or the related company, Ackel Construction, nor recognizes the Debtor's independent fiduciary duty to provide "voluntary and honest disclosure of financial information" to this Court, the UST, and the Debtor's creditors. Although the accountant's testimony that the Debtor consistently failed to generate free cash flow over the course of the case deeply concerned this Court, perhaps just as concerning was his testimony that the instruction he received from the Debtor upon his retention excluded any requirement that he independently verify the veracity of the internal accounting between Ackel Construction and the

Debtor.  See Hr'g Tr. 31:20–33:1 (Jan. 22, 2020).  Per the instructions of the Court and the commitment given by the Debtor on July 29, 2019, an independent third party should have been verifying the Debtor's accounting.

The execution of the Hauling Services Agreement between the Debtor and Ackel Construction was supposed to be the first step in achieving transparency and accuracy in the Debtor's finances.  The Hauling Services Agreement required Ackel Construction to allocate expenses "on a truck-by-truck basis, deduct[ing expenses] from gross revenue prior to payment to Fleetstar," and provided that "revenue and expenses shall be accounted for on a cash basis, with payments of net revenue to Fleetstar on a monthly basis."  [ECF Doc. 178-1, at 1].  Given the strong admonitions delivered by the Court to the Debtor and counsel regarding the fiduciary obligation of the Debtor to act independently and show transparency in its dealings with insiders and related companies, it was disconcerting to hear counsel for Ackel Construction and George Ackel assert nine months into the case that the Hauling Services Agreement did not require reported, monthly reconciliation of the Debtor's expenses on a truck-by-truck cash basis—only the payment of net revenue to the Debtor.  *See* Hr'g Tr. 146:6–148:5 (Feb. 7, 2020); *see also* Hr'g Tr. 122:13–19 (Feb. 7, 2020) ("This chart was put together to give a breakdown, and this chart was—what was not required, [the UST] said that it was required to come with the MORs.  It was not required by Judge Magner or anyone, but it was asked of us to provide this since the last Court hearing, so we provided it.  But it was not part of any court record and no one said was had to provide this report every month with the MORs.").  As George Ackel explained to this Court:

> COURT: . . . It's your testimony that there's no requirement that some sort of report or document be sent to the Debtor on a monthly basis?
>
> WITNESS:   No.  I mean I own both companies.  My staff is running both of these.

Hr'g Tr. 160:2–6 (Feb. 7, 2020).  Essentially, George Ackel testified to this Court, the UST, and creditors that he and Ackel Construction internally reconcile the amounts due to and from the Debtor—so trust him.  "[T]hese are accurate numbers that can be verified through all the correct sources.  I mean I'm an open book.  You can come to my office, anybody that wants to see any truck or anything we have."  Hr'g Tr. 122:20–23 (Feb. 7, 2020).

Despite assurances to the Court that information regarding the Debtor's finances would be complete, disclosed timely, and independently verified, the Debtor has not been forthcoming with information on its assets and expenses, or its transactions with related entities, leaving all interested parties with no choice but to take the word of an insider.  To this day, this Court does not have a clear, confident picture of the pre- and post-petition finances of the Debtor.  And yet, the Debtor, and by relation, George Ackel and Ackel Construction, have enjoyed the benefits of bankruptcy, receiving "temporary relief from substantial financial obligations."  *In re Sal Caruso Cheese, Inc*., 107 B.R. at 817.  This Court believes that it is time for the Debtor's finances, pre- and post-petition, to be reviewed by a disinterested professional.  *See, e.g*., *In re Domiano*, 442 B.R. 97, 109 (Bankr. M.D. Pa. 2010).

Several of the factors articulated in *Collier* and cited by bankruptcy courts support conversion, namely the ability of the trustee in a chapter 7 case to reach assets for the benefit of creditors, the maximization of the estate's value as an economic enterprise, and the need of a chapter 7 case to protect the interests of creditors.  Creditors here will benefit from the appointment of a chapter 7 trustee to serve as an independent fiduciary to evaluate quickly the estate (including the merits of the Old River Lawsuit), prosecute that action and any avoidance actions, if they exist, and make a distribution.  According to the UST, counsel for George Ackel and Ackel Construction provided that office with a log of prepetition insider transactions on the morning of January 22,

2020—ten months after the Petition Date and still containing incomplete information.  *See* Hr'g Tr. 17:12–24 (Jan. 22, 2020).  Even incomplete, that log "shows $64,000 that was transferred to an insider entity six days prior to the bankruptcy being filed."  Hr'g Tr. 20:5–7 (Jan. 22, 2020).  As is the case with many closely held companies in bankruptcy, "[t]here is . . . a question as to whether the debtor would be as impartially motivated to collect the amounts due from its affiliates and to determine whether or not preferential or otherwise avoidable transfers had been made to these affiliates or to its principal shareholder."  *In re Natrl Plants & Lands Mgmt. Co.*, 68 B.R. 394, 396 (Bankr. S.D.N.Y. 1986).  Considering that dismissal would give an insider and competing creditor the reins on the assets of the estate, including avoidance actions, at this point, creditors' best hope for recovery is through conversion.

At the hearing on February 7, the UST declined to take a stance on whether to convert or dismiss as it worried about this case being administratively insolvent.  *See* Hr'g 63:14–17 (Feb. 7, 2020).  But the UST also expressed concerns regarding the ongoing lack of timely and independently verified information regarding the Debtor's pre- and post-petition finances.  *See* Hr'g 60:4–63:4 (Feb. 7, 2020).  And the UST confirmed for this Court that it is not unusual for a chapter 7 trustee to retain counsel on a contingency basis to prosecute claims belonging to the estate.  *See* Hr'g 68:18–69:2 (Feb. 7, 2020).  Although this Court is cognizant of the UST's concerns regarding administrative insolvency, the Court is also encouraged by the UST's statements that chapter 7 trustees routinely work with counsel on a contingency basis and believes a chapter 7 trustee can work with the Debtor's secured lenders quickly and efficiently to resolve claims.  After all, as the UST phrased it in the hearing on January 22, a chapter 7 trustee "is in the job of liquidating assets [and] can figure out if a turnover is in the best interests of the estate, or they can hire an auctioneer to auction that property."  Hr'g Tr. 19:10–15 (Jan. 22, 2020).  On that

day, the UST was of the opinion that a chapter 7 trustee "is in a better position to liquidate these assets than Mr. Ackel."  Hr'g Tr. 19:15–16 (Jan. 22, 2020).  This Court agrees.  "A chapter 7 trustee can certainly move to dismiss the case subsequently, if the trustee concludes that such relief is in the best interests of the estate."  *In re FRGR Managing Member LLC*, 419 B.R. at 580.

Based on the foregoing findings of fact and conclusions of law, this Court (1) GRANTS the *United States Trustee's Motion To Convert Case to Chapter 7, Or, In the Alternative, Dismiss Case*, as supplemented, [ECF Docs. 67, 224 & 282], and (2) CONVERTS this case to one under chapter 7 of the Bankruptcy Code.

New Orleans, Louisiana, March 16, 2020.

MEREDITH S. GRABILL
UNITED STATES BANKRUPTCY JUDGE